[No. D055765. Fourth Dist., Div. One. Oct. 7, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON K., Defendant and Appellant.

1548

## Counsel

Charles R. Khoury, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gary W. Schons, Assistant Attorney General, Rhonda Cartwright-Ladendorf and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**HALLER, J.**—Jason K. appeals after the court denied him relief from an order precluding him from possessing firearms for five years after his release from a facility at which he was detained for psychiatric evaluation under Welfare and Institutions Code section 5150.[1] The court denied the relief based on its finding that the People met their burden to show by a preponderance of the evidence Jason would not be likely to use firearms in a safe and lawful manner. (§ 8103, subd. (f)(6).)

---

[1] We have abbreviated Jason's name to protect his privacy in this matter, which arose from his detention under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.). (See

Jason challenges the sufficiency of the evidence to support the court's factual finding. He also contends section 8103, subdivision (f)'s preponderance of the evidence standard is unconstitutional, and the clear and convincing evidence standard should apply. We reject these contentions and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 22, 2009, Jason's wife returned home about 9:00 p.m. and found Jason intoxicated and passed out on the floor. Twenty-six-year-old Jason had been caring for their two-year-old son, who was sleeping in his bedroom. Jason was the primary caretaker for the son; his wife was employed by the Navy as an active duty communications specialist and was scheduled to deploy the next month.

When Jason woke up, he and his wife began to argue. Jason attempted to leave the residence, but his wife tried to stop him, which resulted in an exchange of shoves between the two. After Jason pushed his wife out of the way, he immediately grabbed a loaded handgun, cocked it, and said he was going to kill himself. His wife restrained Jason, who eventually dropped the gun.

Jason then left the residence and checked himself into Balboa Hospital, and was taken by ambulance to Paradise Valley Hospital. Jason told medical personnel that he and his wife had not been communicating and the problem was getting worse, and he was also experiencing financial stress. Jason was calm and cooperative, but admitted feeling depressed. He denied he intended to commit suicide, and stated he grabbed the gun to get his wife's attention. Although there were reports that he placed a shotgun in his mouth, he and his wife later denied this account. Jason said he had increased his use of alcohol, had been crying twice a week, used medical marijuana for back problems, and was having trouble sleeping. Jason also had abrasions on his hand from punching a wall. The hospital admitting form stated that Jason was "clearly frustrated & has shown a pattern of self-harming activity over past month to try to get wife to notice . . . ." Jason indicated he keeps numerous guns at his house in a safe. Jason's wife told a social worker that Jason threatened to shoot himself with the handgun, but Jason later denied saying this.

Based on an evaluation, the admitting psychiatric resident found there was probable cause to believe that Jason was a danger to himself, and should be admitted for a 72-hour evaluation under section 5150. Although Jason and his

---

Welf. & Inst. Code, §§ 5000, 5325.1, subd. (b); *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008, fn. 1 [36 Cal.Rptr.2d 40, 884 P.2d 988].) All further statutory references are to the Welfare and Institutions Code.

family did not want him to remain in the hospital, a treating psychiatrist concluded that he had to remain in the hospital for the evaluation.

Jason was discharged two days later on April 25. He was not given any medications, but was encouraged to follow up with referrals and an aftercare plan. He was diagnosed with "[m]ajor depressive affective disorder, single episode, severe, without psychotic behavior." His prognosis was "[g]uarded due to chronic mental illness, chronic relapse, and chronic noncompliance." Jason's father told medical personnel that Jason keeps many of his father's guns at Jason's home, and that the father intended to remove all of the guns and return them to the father's home in Arizona. The psychiatric evaluation report noted that Jason is "intelligent, verbal and educated."

At the time of his discharge, Jason was advised of the law prohibiting him from possessing firearms for five years and his right to request a hearing to obtain relief from this prohibition. (§ 8103, subd. (f)(3).) Jason requested a hearing, and a hearing was held on August 21, 2009.

At the outset of the hearing, the People submitted into evidence Jason's confidential medical records and the police report.[2] The court then provided Jason time to review these records, and asked whether the records were accurate. With the exception of denying a statement that the incident involved a shotgun and that he had put the gun into his mouth, Jason acknowledged the information in the medical records was essentially accurate. He emphasized, however, that he did not intend to kill himself with the gun. He said his sole purpose in threatening to use the loaded weapon was to get the attention of his wife, who had not been communicating with him.

The court then took a two-hour break in the hearing, stating it wanted to give Jason the opportunity to "compose" himself and that the district attorney would have the opportunity to be heard during the afternoon hearing.

At the beginning of the continued hearing, the court complemented Jason on his presentation and his responsible attitude, and stated it appeared that Jason had "snapped" on the evening of the incident. The court then asked whether Jason wished to provide any additional information for the court to consider. Jason responded that he realized he made an "extremely dumb" mistake, and that "a lot of good [has] come out of this," including that he has started going to church again and seeing a therapist every other week for the past month. Jason additionally informed the court that he owns more than 20 guns. He said law enforcement officers took possession of two of these guns

---

[2] The appellate record contains the medical records, but does not include the police report. The police report was apparently not maintained in the superior court file. Neither party has claimed our review of the police report is necessary to the resolution of the appeal.

and his parents took the remaining guns to their home in Arizona. Jason said he wanted to use the guns to go hunting, and that he knew how to handle guns because he had collected them since he was 18 years old: "I have over two dozen of them. I'm just as dangerous with the razor I shave my face with in the morning as I am with . . . a gun."

During the hearing, the deputy district attorney argued the court should deny Jason's petition for relief from the firearm ban because "the incident itself involved a gun, a loaded gun" and a young child was at the home during the incident.

After considering all of the evidence and arguments, the court concluded the People met their burden to show that return of the firearms to Jason would be likely to result in him endangering himself or others. The court explained that although Jason appeared to be a responsible individual, he had substantial stress in his life and he had responded to this stress by grabbing a loaded gun. The court emphasized that although it accepted Jason's representation that he did not intend to kill himself, the fact that Jason "went for the gun" during an emotional incident was the "tiebreaker" and supported a conclusion that it was likely Jason would not be safe with his firearms during the statutory five-year period. In so ruling, the court noted its conclusion might be different if there was a higher proof standard ("beyond a reasonable doubt" or "clear and convincing evidence"), but applying the preponderance of the evidence standard, the People met their burden.

## DISCUSSION

### I. *Governing Statutory Law*

 Sections 5150 and 5151 permit a person to be taken into custody and detained for 72 hours when there is probable cause he or she is a danger to himself or others as a result of a mental disorder.[3] (*People v. Keil* (2008) 161 Cal.App.4th 34, 38 [73 Cal.Rptr.3d 600].) Section 8103, subdivision (f) provides that when a person is admitted into a mental health facility under these sections, the individual may not own, possess, control, receive, or purchase firearms for five years after release from the facility. (§ 8103, subd. (f)(1).)

---

[3] Section 5150 provides: "When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team . . . , or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation. . . ." Section 5151 states: "If the facility for 72-hour treatment and evaluation admits the person, it may detain him or her for evaluation and treatment for a period not to exceed 72 hours."

However, the individual may request a hearing to lift this prohibition. (§ 8103, subd. (f)(3), (5); *People v. Keil, supra*, 161 Cal.App.4th at p. 38.) The People "bear the burden of showing by a preponderance of the evidence that the person would not be likely to use firearms in a safe and lawful manner." (§ 8103, subd. (f)(6).) Hearsay evidence, including police reports and medical records, is admissible at the hearing. (§ 8103, subd. (f)(5); see *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 426 [102 Cal.Rptr.2d 157] (*Rupf*).) If the court finds that the People have not met their burden, the restriction is removed, and the person shall be entitled to own, possess, control, receive or purchase firearms, unless another legal restriction applies. (§ 8103, subd. (f)(1).)

## II. *Sufficiency of the Evidence*

Jason challenges the sufficiency of the evidence to support the court's factual conclusion that he would not be likely to use firearms in a safe and lawful manner.

In reviewing this contention, we apply the substantial evidence standard. (*People v. Keil, supra*, 161 Cal.App.4th at p. 38.) We must "affirm if 'substantial evidence supports the court's determination that return of the firearms to appellant would be likely to result in endangering appellant or other persons.' " (*Ibid.*) In determining whether a court's ruling is supported by substantial evidence, we view the whole record in a light most favorable to the ruling, resolving all evidentiary conflicts and drawing all reasonable inferences supporting the court's decision. (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336 [95 Cal.Rptr.2d 16].) If " 'there is "substantial evidence," the appellate court *must affirm* . . . even if the reviewing justices personally would have ruled differently had they presided over the proceedings below, and even if other substantial evidence would have supported a different result.' " (*Rupf, supra*, 85 Cal.App.4th at p. 429, fn. 5.)

The record contains substantial evidence supporting the court's denial of Jason's petition. The undisputed facts show that Jason was under significant stress regarding his marriage and financial matters. He responded to this stress by using alcohol to the point of passing out in his own home. When awakened by his wife and after a brief argument, Jason immediately grabbed a loaded handgun, cocked it, and told his wife he was going to kill himself. The couple's two-year-old son was sleeping in his bedroom at the time. Jason had abrasions on his hand from recently punching a wall. Jason was so concerned with his state of mind that he went to a hospital seeking a psychological evaluation. After several days of evaluation, Jason was diagnosed with "[m]ajor depressive disorder, single episode, severe, without psychosis."

At the hearing, Jason said he had taken positive steps since the incident, including regularly attending church and going to a family therapist. The court found Jason's presentation and attitude to be commendable, but after viewing the totality of the circumstances, the court determined the People met their burden. The court reasoned that the fact that Jason instinctively reacted to a stressful situation by *grabbing a loaded firearm* showed that Jason was not likely to be safe with his firearms.

██ In challenging this conclusion, Jason argues that his medical diagnosis established that he only had a *"single episode"* of a depression disorder. However, the diagnosis also stated that this episode was "severe." Moreover, the fact that 26-year-old Jason had apparently experienced only one serious manifestation of this disorder did not necessarily show that it would not occur again, particularly when some of the stress factors that precipitated this incident were still present. Although Jason was taking steps to improve his mental health, there was a reasonable basis for the court to find that the factors triggering the handgun incident had not been entirely eliminated, and that if there was another episode of mental instability, Jason could repeat this action, creating a serious safety concern for Jason and those around him. A "court may properly consider whether the circumstances leading to the section 5150 detention might occur again and whether possession or control of those confiscated weapons in such circumstance would pose a risk of danger to appellant or to others." (*Rupf, supra*, 85 Cal.App.4th at p. 424 [interpreting parallel § 8102 provision].) Further, a single incident leading to a section 5150 commitment can support a section 8103, subdivision (f) finding. (See *People v. Keil, supra*, 161 Cal.App.4th at pp. 38–39.)

Jason contends the court placed improper emphasis on the fact that the district attorney was opposing the return of the guns. This argument is unsupported. The hearing transcript shows the trial court fully understood the applicable law and relevant factors, and that it conducted a careful and thorough analysis of the factual circumstances. There is no basis to find the court reached its conclusion based solely or primarily on the fact that the district attorney was opposing the return of the guns.

### III. Standard of Proof

#### A. Jason's Challenge to the Statutory Proof Standard

██ Section 8103, subdivision (f)(6) provides that at the hearing at which a person seeks return of the firearms, the "people shall bear the burden of showing by a preponderance of the evidence that the person would not be likely to use firearms in a safe and lawful manner." Jason contends this

preponderance of the evidence standard is constitutionally infirm, and the "clear and convincing evidence" standard should instead apply.

In support of this contention, Jason relies on the recent United States Supreme Court decisions recognizing an individual's right to bear arms under the Second Amendment of the United States Constitution. (*McDonald v. City of Chicago* (2010) 561 U.S. ___ [177 L.Ed.2d 894, 130 S.Ct. 3020] (*McDonald*); *District of Columbia v. Heller* (2008) 554 U.S. 570 [171 L.Ed.2d 637, 128 S.Ct. 2783] (*Heller*).)

In *Heller*, the high court evaluated the meaning of the Second Amendment, and concluded the constitutional right to possess firearms was not limited to possession for military use and included an individual's right to possess firearms in the home for self-defense. (*Heller, supra*, 554 U.S. at pp. 573–577, 591–592, 634–635 [128 S.Ct. at pp. 2787–2788, 2797, 2821–2822].) But the court stated that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" (*id.* at p. 626 [128 S.Ct. at p. 2816]), and specifically noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places . . . ." (*Id.* at p. 626 [128 S.Ct. at pp. 2816–2817].) The court further explicitly recognized "the problem of handgun violence in this country," and confirmed that the "Constitution leaves . . . a variety of tools for combating that problem . . . ." (*Id.* at p. 636 [128 S.Ct. at p. 2822].)

In *McDonald*, the court held the Second Amendment right is applicable to the states through the due process clause of the Fourteenth Amendment, but "repeat[ed] [its] assurances" that "the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose' " and that its holding "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill . . . .' " (*McDonald, supra*, 561 U.S. at p. ___ [130 S.Ct. at p. 3047], quoting *Heller, supra*, 554 U.S. at p. 626 [128 S.Ct. at pp. 2816–2817].)

In his appellate briefing, Jason engages in a lengthy discussion of whether intermediate or strict scrutiny applies to evaluate a challenge to the constitutionality of a statute infringing on the Second Amendment's right to bear arms, an issue left open in *Heller*. (*Heller, supra*, 554 U.S. at p. 628 & fn. 27 [128 S.Ct. at p. 2817 & fn. 27].) However, we need not reach this issue because Jason is not challenging the constitutionality of the statute that allows the state to temporarily restrict firearm use to an individual admitted to a facility under section 5150. Instead, he argues the United States Constitution mandates that the People be subject to a higher burden of proof than is set

forth in section 8103, subdivision (f)(6). In analyzing this argument, we apply the tests developed to determine the appropriate proof standard when the government seeks to infringe upon an individual's constitutional right.

### B. *Legal Principles Governing Required Standard of Proof*

■ An individual has a constitutional right to procedural due process when the government deprives an individual of a liberty or property interest. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 332 [47 L.Ed.2d 18, 96 S.Ct. 893].) One component of procedural due process is the standard of proof used to support the deprivation. (*Santosky v. Kramer* (1982) 455 U.S. 745, 754 [71 L.Ed.2d 599, 102 S.Ct. 1388] (*Santosky*).) The standard of proof must satisfy " 'the constitutional minimum of "fundamental fairness." ' " (*Id.* at p. 756, fn. 8.) To determine whether a proof standard meets this constitutional minimum, the courts evaluate three factors: (1) the private interest affected by the proceeding; (2) the risk of an erroneous deprivation of the interest created by the state's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. (*Id.* at p. 754; *Mathews v. Eldridge, supra*, 424 U.S. at p. 335.)

In addition, the courts consider the purpose underlying the proof standard, which is to delineate " ' "the degree of confidence our society thinks [a fact finder] should have in the correctness of factual conclusions for a particular type of adjudication." ' " (*Santosky, supra*, 455 U.S. at p. 755; see *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546 [110 Cal.Rptr.2d 412, 28 P.3d 151] (*Wendland*).) The required minimum standard reflects a "societal judgment about how the risk of error should be distributed between the litigants." (*Santosky, supra*, 455 U.S. at p. 755.) When the preponderance of the evidence standard of proof is used, the risk of an erroneous deprivation of the interest is shared "in roughly equal fashion" between the parties. (*Addington v. Texas* (1979) 441 U.S. 418, 423 [60 L.Ed.2d 323, 99 S.Ct. 1804].) The beyond a reasonable doubt standard is "designed to exclude as nearly as possible the likelihood of an erroneous judgment" and "imposes almost the entire risk of error upon [the government]." (*Id.* at pp. 423–424.) The clear and convincing evidence standard represents an intermediate standard that "reduce[s] the risk to the [individual] . . . by increasing the [government's] burden of proof." (*Id.* at p. 424.)

Under this constitutional framework, proof by a preponderance of the evidence generally suffices to satisfy due process in civil cases. (See *Price Waterhouse v. Hopkins* (1989) 490 U.S. 228, 253 [104 L.Ed.2d 268, 109 S.Ct. 1775]; *Wendland, supra*, 26 Cal.4th at p. 546 [the "default standard of proof in civil cases is the preponderance of the evidence"].) However, when "the government seeks to take unusual coercive action . . . against an individual,"

the clear and convincing evidence standard may be required. (*Price Waterhouse, supra,* at p. 253.) Courts have thus applied the clear and convincing evidence standard in civil cases "when necessary to protect important rights" (*Wendland, supra,* 26 Cal.4th at p. 546), such as when the proceedings involve " 'a significant deprivation of liberty' " or " 'stigma' " (*Santosky, supra,* 455 U.S. at p. 756). For example, courts have required the clear and convincing evidence standard in proceedings leading to the termination of parental rights (*id.* at pp 769–770; *In re Angelia P.* (1981) 28 Cal.3d 908, 922 [171 Cal.Rptr. 637, 623 P.2d 198]), involuntarily civil commitment (*Addington v. Texas, supra,* 441 U.S. at p. 425), deportation (*Woodby v. Immigration Service* (1966) 385 U.S. 276, 285 [17 L.Ed.2d 362, 87 S.Ct. 483]), a conservator's decision to withhold artificial nutrition and hydration (*Wendland, supra,* 26 Cal.4th at p. 524), and a conservator's decision to authorize sterilization of a developmentally disabled conservatee (*Conservatorship of Valerie N.* (1985) 40 Cal.3d 143, 168 [219 Cal.Rptr. 387, 707 P.2d 760]).

But the fact that a proceeding may result in a loss of an important constitutional right does not necessarily mean that the preponderance of the evidence standard violates due process. For example, in *Jones v. United States* (1983) 463 U.S. 354 [77 L.Ed.2d 694, 103 S.Ct. 3043], the United States Supreme Court upheld a statute permitting the automatic civil commitment of a criminal defendant who had obtained a verdict of not guilty by reason of insanity by proving his mental illness in the criminal case by a preponderance of the evidence. The *Jones* court noted that the clear and convincing evidence standard was generally required to civilly commit a person because it was "inappropriate to ask the individual 'to share equally with society the risk' " of an erroneous adjudication of mental illness. (*Id.* at p. 367.) But the court found there was a diminished risk of error when the individual had affirmatively advanced and proven the mental illness as a defense in a criminal proceeding, and accordingly the preponderance of the evidence standard comported with due process for commitment of insanity acquittees. (*Id.* at pp. 367–368.)

## C. *Analysis*

■ Applying the applicable legal principles, we conclude section 8103, subdivision (f)'s preponderance of the evidence standard preserves fundamental fairness and properly allocates the risk of an erroneous judgment pertaining to firearm use between the government and an individual who was hospitalized after a finding that he or she presented a danger to himself or others (§§ 5150, 5151).

■ First, with respect to the private interest element of the due process test, an individual's right to possess firearms is of fundamental constitutional

stature. (*Heller, supra*, 554 U.S. 570 [128 S.Ct. 2783]; *McDonald, supra*, 561 U.S. ___ [130 S.Ct. 3020].) However, this constitutional right is subject to the state's traditional authority to regulate firearm use by individuals who have a mental illness. (*Heller, supra*, 554 U.S. at p. 626 [128 S.Ct. at pp. 2816–2817].) Moreover, the length of the threatened loss is a relevant factor in analyzing the nature of the private interest. (*Santosky, supra*, 455 U.S. at p. 758.) Under section 8103, the deprivation of the right is lengthy, but temporary, lasting for five years. Further, the infringement concerns the loss of property, and does not involve deprivation of physical liberty or severance of familial ties. The deprivation is thus not akin to the types of cases such as termination of parental rights, civil commitment, withholding of nutrition/hydration, forced sterilization, or deportation where a clear and convincing evidence standard is typically imposed. Additionally, although the loss of the right to possess firearms can impact an individual's ability to defend himself or herself, the deprivation does not leave the individual exposed to danger without recourse to other defensive measures, such as installing home security devices and summoning the police.

Balanced against the individual's temporary loss of the right to possess firearms is the state's strong interest in protecting society from the potential misuse of firearms by a mentally unstable person. (*Rupf, supra*, 85 Cal.App.4th at p. 423 [noting that it is "not unreasonable to conclude there is a significant risk that a mentally unstable gun owner will harm himself or others with the weapon"]; see *Heller, supra*, 554 U.S. at p. 626 [128 S.Ct. at pp. 2816–2817]; *McDonald, supra*, 561 U.S. at p. ___ [130 S.Ct. at p. 3047].) Section 8103 (and its counterpart § 8102, which permits confiscation of firearms) are preventative in design; the fundamental purpose is to protect "firearm owners and the public from the consequences of firearm possession by people whose mental state endangers themselves or others." (*People v. One Ruger .22-Caliber Pistol* (2000) 84 Cal.App.4th 310, 315 [100 Cal.Rptr.2d 780].) These protective statutes "limit the availability of handguns to persons with a history of mental disturbance . . . to protect those persons or others in the event their judgment or mental balance remains or again becomes impaired." (*Rupf, supra*, 85 Cal.App.4th at p. 424.)

 Although the preponderance of the evidence standard requires the individual to share equally in the risk of an erroneous adjudication, this risk sharing is justified under circumstances where an individual exhibited a mental disorder sufficient to warrant hospitalization because of facts showing the individual may endanger himself or others. This includes situations, such as here, where the hospitalization occurred after the individual held a loaded gun and threatened to use the gun during an emotional argument while another was present and his two-year-old son slept in the next room. The statute places the burden on the government to show the individual would not be likely to use the weapons in a safe manner. (§ 8103, subd. (f)(6).) But if the government

was required to satisfy this burden by clear and convincing evidence, this would increase the possibility that a person might be gravely injured or killed if the government failed to meet this rigorous proof burden. When the gravity of the potential consequences of allowing possession of guns by an individual with a history of a manifested mental disturbance is balanced against the temporary deprivation of access to these weapons, the balance weighs in favor of permitting proof by a preponderance of the evidence.

We conclude section 8103, subdivision (f)(6)'s preponderance of the evidence standard comports with due process and did not unduly violate Jason's constitutional rights.

## DISPOSITION

The order is affirmed.

Huffman, Acting P. J., and Irion, J., concurred.

A petition for a rehearing was denied October 26, 2010, and appellant's petition for review by the Supreme Court was denied January 26, 2011, S188269.