Filed 6/10/15  In re K.C. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re K.C. et al., Persons Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J. C., <br><br> Defendant and Appellant. | B258956 <br> (Los Angeles County <br> Super. Ct. No. DK05282 ) |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

Appellant J.C. (Father), father of 12-year old daughter "Ki" and 10-year old son "Ka," appeals the juvenile court's dispositional order, removing the children from his custody based on jurisdictional findings that Father suffers from mental illness and had recently engaged in acts of domestic violence. Father contends the disposition is not supported by substantial evidence that his mental condition jeopardized the children's safety. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 21, 2014, the children's mother, P.S. (Mother), called 911 after Father became irrationally angry and began breaking things. At the time, Mother was attempting to pack up the family's belongings because they had been evicted from their apartment.[1] Father had earlier locked the family out of the apartment and repeatedly asked the children "'What's going on? Who's doing this?'" Mother was concerned for the family's safety, and expressed particular concern due to the presence of guns owned by Father.

Father was put on a Welfare and Institutions Code section 5150 hold at Olive View Medical Center while hospital personnel conducted a psychological evaluation.[2] Father was unable to understand why he was there and asked the same questions over and over. His initial interview was terminated prematurely because he was "labile, angry, argumentative, and rapidly escalating." He was evaluated as

---

[1] Father had lost his job approximately four months earlier. Mother had been laid off for approximately one year and could no longer work due to rheumatoid arthritis.

[2] Sections 5150 and 5151 permit authorities to take a person into custody and to detain him or her for 72 hours when there is probable cause to believe he or she is a danger to him or herself or others as a result of a mental disorder. (*People v. Jason K.* (2010) 188 Cal.App.4th 1545, 1552.) As a result of the hold, Father's guns were confiscated. At the time of the detention hearing, he was trying to get them back.

Undesignated statutory references are to the Welfare and Institutions Code.

2

being at a high risk of danger to others due to the incidents of violence at home, his delusions, and his level of paranoia, anger and emotional instability. He was given Haldol, Ativan, and Benadryl. During his stay, Father made a number of statements to hospital personnel symptomatic of delusions and paranoia, for example, stating that his dreams were being recorded by satellite, that Mother and the maternal grandmother were spies for the Thai royal family, that Steven Spielberg was spying on him and owned the apartment from which the family had been evicted, and that when he went to the FBI to report his concerns, an actress falsely presented herself to him as an agent. He was diagnosed as suffering from a psychotic disorder, possibly substance induced.[3] At his discharge, he was assigned a psychiatrist and prescribed Zyprexa.[4]

The Department of Children and Family Services (DCFS) became involved after receiving a report that Father had been hospitalized for exhibiting psychosis, paranoia and violent tendencies, and that he possessed firearms. Interviewed by the caseworker on May 7, 2014, Mother and the children reported that approximately seven months earlier, Father had begun accusing her and the maternal grandmother of being spies. An incident of domestic violence had occurred in October 2013. Mother had scratched and hit Father. He pushed her and she fell, bruising her arm.[5] Referring to the April 2014 incident, Mother said she had never seen Father so angry before and believed he had "'reached a breaking point.'" Ki was outside when Father became agitated, and heard Father

---

[3]     Mother allegedly told hospital personnel that Father was "'smoking drugs'" after losing his job. There is no corroboration of this contention in the record, and ultimately no allegations of drug use were pled in the petition or found true by the court.

[4]     Zyprexa is an antipsychotic medication. (See *In re Greenshields* (2014) 227 Cal.App.4th 1284, 1288; *People v. Cuevas* (2013) 213 Cal.App.4th 94, 108.)

[5]     Ki was in her room during the incident, but she heard it and observed the bruising and Mother crying. Ka was not home, but observed the bruising.

breaking things. Ka was with his aunt, but came back in time to see police cars arrive to take Father away. He was scared and worried because he did not know what would happen to Father. During the caseworker's May 7 interview, Father was agitated and defensive, claiming his family was in danger from "'spying and videotaping.'" Both Mother and Father said that Father had been allowed by his psychiatrist to discontinue the Zyprexa due to side effects he was experiencing.

On May 30, 2014, DCFS filed a section 300 petition, seeking jurisdiction under section 300, subdivision (a) (serious physical harm) and (b) (failure to protect) based on Father's mental illness and the two incidents of domestic violence. It was pled as a non-detain petition and accompanied by a non-detain report. However, in a last minute information for the court, DCFS asked that the children be detained from Father.[6] The court ordered the children detained from Father.

Interviewed again for the June 2014 jurisdiction/disposition report, Mother stated that Father had accused her of having a radio in her teeth and not being the children's real mother. She stated that his abnormal thoughts were focused on her and the maternal and paternal grandmothers, and that he was good to the children. Ka said he was not afraid of Father. Father continued to demonstrate impaired mental health. He told the caseworker that Mother and the maternal grandmother were being controlled by the Thai royal family, that Mother had been sent by the Thai royal family to marry him and ruin his family, and that he had gotten secret messages when he was working that confirmed his suspicions. Father was not taking any medication and had not obtained a new prescription. He reported

---

[6]     The day of the hearing, Mother had reported that Father had refused to come to the hearing, denied having mental illness, and said he would not take medication. Father told the caseworker he had been illegally detained and placed on the 5150 hold, and that he had no mental health problems.

4

having difficulty obtaining an appointment to see a doctor or psychiatrist. On June 27, 2014, DCFS and the parents held a Child and Family Team meeting. Father continued to state that nothing was wrong with his mental health and that his claim of being spied on was a fact, not evidence of paranoia. The caseworker concluded that Father lacked an understanding of his mental health needs and was unlikely to obtain treatment, "rendering him unable to provide suitable care and supervision of the children, and placing them at risk of physical and emotional harm."[7]

At the August 19, 2014 jurisdictional hearing, Father's counsel asked the court to dismiss the petition, denying Father suffered from mental illness and contending that even if he did, there was no evidence of a substantial risk of physical harm to the children. The children's attorney asked the court to sustain the allegation under section 300, subdivision (b) that Father suffered from mental and emotional problems and to dismiss the allegations under subdivisions (a) and (b) of domestic violence, contending that Father's conduct on those occasions should be viewed as symptomatic of his mental health issues, rather than as a separate basis for assertion of jurisdiction. The court sustained all the allegations of the petition, the domestic violence allegations under both subdivision (a) and subdivision (b), and the mental and emotional problem allegation under subdivision (b). The court found true (1) that Father "suffers from mental and emotional problems including delusion and paranoi[a]"; (2) that Mother and Father engaged in a violent altercation in October 2013, in which Father struck Mother, inflicting a bruise on her arm, and Mother scratched and struck Father; and (3) that in April 2014, Father broke dishes in the home as a result of his mental health

---

[7]     In August 2014, Father claimed to be seeing a psychiatrist and to be taking prescribed medications, but he continued to express delusional and paranoid beliefs and to believe he did not need psychiatric help or medication. The caseworker was unable to verify Father's claim because Father did not sign a release.

issues.  The court found that Father's mental and emotional problems and the violent altercations "endanger[ed] the children's physical health and safety and place[d] [them] at risk of physical harm, damage and danger," and rendered Father incapable of providing the children with regular care and supervision.

Turning to disposition, the court placed the children with Mother and allowed Father monitored visits only, not to take place in the family home or to be monitored by Mother.  The court-ordered case plan required Father to obtain a psychiatric evaluation, to participate in individual counseling with a licensed therapist to address case and mental health issues, and to take all prescribed psychotropic medications.

## DISCUSSION

The sole issue raised on appeal is whether the court's dispositional order removing the children from Father's custody and preventing Father from living with his family was supported by substantial evidence.[8]

The governing statute provides that "[a] dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and

---

[8]     Respondent suggests that by signing the court-ordered case plan and failing to specifically object to the court's disposition at the hearing, Father forfeited his right to raise any issues concerning the dispositional order on appeal.  At the hearing, Father's counsel asked the court to dismiss the petition, contending that Father was not suffering from mental illness and that there was no evidence of a substantial risk that the children would suffer serious physical harm or illness.  After making its contrary jurisdictional findings, the court proceeded immediately to disposition, without giving counsel an opportunity to comment or object.  Counsel's initial comments were sufficient to preserve both jurisdictional and dispositional issues.  We do not view Father's signature on the court-ordered case plan as evidence of forfeiture.  By signing it, Father acknowledged the court's reunification requirements; he did not signal his acquiescence to them.

6

convincing evidence . . . [¶] . . . [that] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody . . . ." (§ 361, subd. (c)(1); *In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.) To support a dispositional order removing custody from a parent, the court may consider "a broad class of relevant evidence in deciding whether a child is at substantial risk from a parent's failure or inability to adequately protect or supervise the child" (*In re Y.G.* (2009) 175 Cal.App.4th 109, 116), including "the parent's past conduct as well as present circumstances." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) The court's jurisdictional findings represent prima facie evidence that the child cannot safely remain in the home. (*In re T.V.* (2013) 217 Cal.App.4th 126, 134; *In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) On review of the court's dispositional findings, "we employ the substantial evidence test, however bearing in mind the heightened burden of proof." (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

On appeal, Father does not dispute the finding that he suffers from a serious mental illness that causes him to experience delusions and extreme paranoia. He contends, however, that the jurisdictional findings rely solely on the preliminary diagnosis of psychosis and that DCFS failed to present clear and convincing evidence that his mental illness jeopardized the children's safety or caused a substantial risk of harm. (See *In re Jamie M.* (1982) 134 Cal.App.3d 530, 540 ["Harm to the child cannot be presumed from the mere fact of mental illness of the parent . . . ."]; *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424 [parent's diagnosis "is a starting point, not a conclusion"].) Father is mistaken. The court found true two incidents evidencing Father's propensity for violence. The first occurred in October 2013, when he struck Mother, leaving a bruise on her

arm. The second occurred in April 2014, when Father became irrationally angry and began breaking things in the family home. Mother, who had been witness to Father's deterioration over the prior seven months, called 911 on April 21 because she had never seen Father so angry before and believed he had "'reached a breaking point.'" Mother's evaluation was confirmed by hospital personnel, who described Father as "labile, angry, argumentative, and rapidly escalating" when he was brought in, and placed him on a 5150 hold. Father was found by hospital personnel to present a high risk of danger to others due to his violent behavior, anger, emotional instability, paranoia and delusions. He was given very powerful medication to calm him in the short term, and a prescription for anti-psychotic medication. Unfortunately, Father was unable to tolerate the medication, and failed to obtain a new prescription, due at least in part to his unwillingness to accept that he had a mental health problem.

The fact that Father had not yet targeted the children for his suspicions or engaged in violent conduct directed at them did not preclude a dispositional order removing them from his custody. "The . . . child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child." (*In re Cole C.*, *supra*, 174 Cal.App.4th at p. 917; accord, *In re Kristin H., supra,* at pp. 1656-1658.) The record established that when untreated, Father presented a high risk of danger to others. The record further established that Father remained in denial about his mental health problems and the need for treatment up to the time of the jurisdictional hearing. Father's assertion that he was taking medication and seeing a psychiatrist at the time of the hearing could not be confirmed. Moreover, assuming Father's assertions were true, the medication was clearly not having the desired effect, as he continued to express delusional and paranoid beliefs. In short, the facts established a volatile situation that needed to be brought under control by psychiatric personnel before Father could safely be

returned to the family home. The court's dispositional order was supported by substantial evidence.

## DISPOSITION

The dispositional order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


WILLHITE, Acting P. J.


COLLINS, J.