Filed 3/15/16  P. v. P.T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E063019 |
| v. | (Super.Ct.Nos. RIC1309769 & RIC1402069) |
| P.T., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark E. Johnson, Judge. Affirmed.

Alan S. Yockelson for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Brendon W. Marshall, and Joy N. Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

I

INTRODUCTION

When appellant P.T. was detained and hospitalized pursuant to Welfare and

1

Institutions Code section 5150,[1] P.T.'s firearms were confiscated under section 8102. P.T. petitioned for return of his firearms under section 8103 (P.T.'s petition).[2] P.T. appeals the trial court order denying his petition and granting the Riverside Police Department's petition to prohibit P.T. from possessing firearms for five years under section 8102 (Riverside's petition).[3] P.T. contends there was insufficient evidence supporting the trial court's finding that return of his firearms would likely result in endangering himself or others. We disagree, and affirm the judgment.

II

FACTS AND PROCEDURAL BACKGROUND

On August 5, 2013, P.T. attended a marital counseling session at Grove Counseling Center. His wife, A.T., arrived 20 minutes late for the conjoint session and was asked to leave. The therapist, Troy Hughes, was a marriage and family therapist intern and former law enforcement officer, with a masters degree in psychology. As a therapist trainee and then an intern at Grove Counseling Center for over one year (39 days as an intern), he had completed approximately 1,200 of the 3,000 hours required for a marriage and family therapist license (80 to 100 hours as an intern). P.T. had seen Hughes for therapy about four times before August 5, 2013. During the therapy, Hughes

_____

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

[2] Riverside County Superior Court case No. 1402069.

[3] Riverside county Superior Court case No. 1309769.

focused on treating P.T.'s posttraumatic stress disorder (PTSD), inter-personal relationship issues, and depression.

P.T., who was 59 years old at the time of the therapy session, was facing an impending divorce of his second wife. The four and a half year marriage had been volatile almost from the beginning. Three days before P.T.'s therapy on August 5, 2013, P.T.'s wife had served him with a temporary restraining order (TRO) and P.T. moved out of his home. P.T. filed for divorce in September 2013, and the divorce became final in March 2014. P.T. had also previously experienced other traumatic events, including his first wife's miscarriage in 1980, the drowning death of his first son in 1983, the death of his first wife in 2002, the deaths in 2005 of his second son from overdosing on energy drinks and of P.T.'s mother, and the death of P.T.'s father shortly thereafter.

**Hughes's Testimony**

During the joint hearing on P.T.'s and Riverside's petitions, Hughes testified that P.T.'s therapy session on August 5, 2013, began with a discussion of P.T.'s marital problems and impending divorce. Before seeing P.T. on August 5, 2013, Hughes had concluded P.T. showed traits of suffering from PTSD and major depressive disorder, caused by the deaths of his children, somatic issues, physical pain, ongoing marital issues, and work issues. Hughes described P.T.'s affect during therapy on August 5, 2013, as "emotionally distraught." He was weeping, angry, extremely frustrated, and overwhelmed. P.T. told Hughes he was overwhelmed by what was going on in his life; he had suffered the deaths of his children and would prefer to be with them; and it would be no problem for him to make this happen. P.T. indicated he had no hope.

3

When Hughes asked P.T. what his plan was, P.T. said he could go to a place outside his trailer where he was staying and use one of his guns to kill himself. Hughes asked P.T. if he understood that, because of P.T.'s statements, Hughes would have to make a section 5150 referral. P.T. responded that he would work the system at the hospital and upon his release, he would "use his military training to escape and to evade." Then he would kill himself. P.T. said he did not need a gun; he would step in front of a train. Hughes stated in his therapy notes, "High intimations of suicidal ideation, has weapons, has secluded place to act, no surviving." Right after saying he was going to kill himself, P.T. directed anger toward his wife. He said he would "burn her in divorce."

Hughes testified that what distinguished P.T. from his other clients who did not qualify for a section 5150 referral was that P.T. had provided information indicating he had no hope, he had a plan and the tools to harm himself, he identified a place where he could carry out his plan, and he had a history of the type of trauma known to lead to suicidal ideation. P.T. had lost both of his sons and his first wife. This greatly impacted his emotional status. In addition, P.T. "suffer[ed] horribly with . . . physical ailments and then things weren't going well in his personal life. He was just overwhelmed." Hughes thought the police should be contacted because P.T. was in danger of harming himself and Hughes had an ethical responsibility to ensure P.T. received the best treatment possible. In P.T.'s mental state, he needed a higher level of care. He was overwhelmed emotionally. P.T. was very moody. He would become extremely angry, then cry, become very quiet, and then talk about a different subject.

In accordance with the Grove Center's protocol, Hughes stepped out of the therapy session and consulted with his supervisor, George Williamson Cumming, III. Cumming had extensive experience making section 5150 evaluations. Hughes and Cumming discussed P.T.'s risk assessment factors and Hughes answered Cumming's questions. After Cumming concluded P.T. should be referred to the police for a section 5150 evaluation, Hughes notified support staff and requested staff to call the Riverside Police Department. As an intern, Hughes was not permitted to make the determination to request a section 5150 referral on his own. He was required first to have his supervisors review all of his evaluations and provide updates and approve the referral.

**Cumming's Testimony**

Cumming was director of care and counseling ministries and director of Grove Counseling Center. He supervised interns and trainees such as Hughes. Before assigning P.T. to Hughes as a patient, Cumming met with P.T. and was aware of P.T.'s history of tragic events. As Hughes's supervisor, Cumming was aware of what was going on during P.T.'s therapy sessions. Cumming met with Hughes after his individual sessions with P.T. and discussed the sessions. Cumming also met with Hughes and his peers during group meetings to discuss cases.

Cumming testified that the risk factors discussed with Hughes on August 5, 2013, included P.T.'s refusal to agree to a safety contract, P.T.'s feeling of extreme hopelessness, and P.T.'s feeling of helplessness from his impending divorce. Cumming explained that a safety contract is an agreement to commit to being safe and adhering to a safety plan that provides extra support and a means of remaining safe and avoiding the

5

need to go to the hospital. P.T. had indicated to Hughes that even a section 5150 referral would not stop him from killing himself: he did not need a gun; he could walk in front of a train. P.T. said that if there was a 5150 referral, he would work the system. Another risk factor discussed was P.T.'s possession of weapons and his volatile emotional state, in which P.T.'s moods changed rapidly. He was impulsive. After discussing with Hughes by telephone P.T.'s condition and risk factors, Cumming approved the section 5150 referral.

When the police arrived at the Grove Counseling Center, Hughes informed the two officers of P.T.'s statements and then left the room. Hughes was not present during P.T.'s police section 5150 interview. During the interview, according to the police report, P.T. repeated the statements made to Hughes. He also said he had just lost his job, had no money, could not live without his wife, and was going to die alone. He said he had no one left in his life, no reason to go on living, and it was time to join his deceased children. P.T. acknowledged he had checked himself into a mental hospital approximately four years before for a similar situation. The police determined P.T. met the requirements for a section 5150 detention, completed the 5150 application, and transported P.T. to the Riverside County Regional Medical Center for a section 5150 hold and treatment. P.T. was held for about five hours and then released. P.T. signed a weapons seizure notification form.

On August 13, 2013, P.T. attended another therapy session with Hughes. P.T. was guarded and reserved during the session. He seemed better. P.T. did not make any statements regarding self-harm and seemed less despondent and depressed. P.T. agreed

6

to a no suicide, no harm safety contract.  Hughes also met with P.T. on August 20, 27, and September 3, 2013.  During this time, P.T. was still struggling with somatic issues and personal issues.  He also suffered from depression and PTSD.

Because Hughes's relationship with P.T. had deteriorated, Cumming reassigned P.T. to another therapist, Michael Trippet.  After the section 5150 hold, Cumming saw P.T. on multiple occasions but only in a social context because they attended the same church.  Cumming did not think P.T. would need another section 5150 referral or was a danger to himself or others.  However Cumming did not perform a clinical section 5150 assessment of P.T. after August 5, 2013.

**P.T.'s Testimony**

P.T. testified in December 2014, at the joint hearing on P.T.'s and Riverside's petitions, that he was no longer depressed or had anxiety.  He had stopped attending counseling.  However, no mental health providers or doctors told him he no longer suffered from anxiety, although his therapist, Mike Trippet of Grove Counseling Center, told P.T. he had dealt with his depression and anxiety.  Trippet said he was "fine tun[ing] dealing with things."  P.T. stopped seeing Trippet because of the instant litigation.  No clinicians or therapists told him he no longer had any depressive issues.

According to P.T., Dr. Emanuel Tau, a clinical and forensic psychologist retained by P.T. as an expert witness, told P.T. his anxiety, depression, and coping levels were relatively normal.  P.T. acknowledged that in 2010, about 10 months after he married A.T., he voluntarily checked in to a mental health facility because he was suffering from anxiety and marital issues.  He was there for 10 days.  A.T. had just filed for a domestic

7

violence restraining order against him in June 2010. The doctors at the facility told him he had "some sort of psychosis and depression issues."

P.T. conceded he was wrong in threatening A.T. by telling her that only one of them would get out of their marriage alive. P.T. also put a sign on the back of her car which said, "Cheating Wife," because he suspected A.T. was cheating on him. P.T. claimed he made the life threatening statements during therapy out of frustration with his marital situation, and his statements were not sincere. P.T. believed Hughes and Cumming had conspired against him and lied about P.T. to protect themselves because P.T. would not capitulate and they did not properly handle the situation on August 5, 2013.

**Dr. Tau's Expert Testimony**

Dr. Tau, who had expertise in threat assessment, reviewed P.T.'s medical records, A.T.'s restraining order requests, and other documents. He also interviewed P.T. twice, once on June 25, 2014, for almost two hours, and again on October 16, 2014, for about an hour. Tau testified he believed Hughes and Cumming mishandled the August 5 incident because Cumming was not present to evaluate P.T. Cumming should have been there to evaluate P.T. in person. Tau believed that, since Hughes had been an intern for only six weeks, Cumming's consultation with Hughes by telephone was inadequate.

Tau concluded that any threats P.T. had made were not credible, such as his threat to shoot himself and jump in front of a train. P.T. was merely "venting." In Tau's opinion, P.T. handled the loss of his two sons extremely well. Tau assessed P.T. to be "a very robust and resilient individual." Tau acknowledged P.T. nevertheless was more

8

vulnerable when experiencing the termination of his second marriage because the trauma from the previous loss of his two sons. However, P.T.'s divorce was a temporary stress factor.

Tau further concluded P.T. would be likely to use firearms in a safe and lawful manner. When making his assessment, Tau considered whether P.T. made any threat posturing or violence towards himself or others, any preparatory behaviors for committing violence upon himself, and any "rehearsal fantasies of target violence" on himself. Tau explained that, although P.T. had made some threats, they were not preparatory. They were emotional responses regarding his impending divorce, made to his therapist during therapy. Tau did not find any evidence of any preparatory behaviors in furtherance of planning to commit a malicious act. As to rehearsal fantasies or target of violence, Tau did not find that P.T. had any particular obsessions or fixations regarding a malicious act.

Tau further looked for evidence or warning signs of a pathway toward targeted violence, such as "grievances, violent ideations, research and planning attack, pre-attack preparation, probing and reaching behaviors, then the attack." P.T. had many emotional grievances relating to A.T. He also had violent ideations but they were nonclinical threats, consisting of venting his anger and responding emotionally during therapy regarding his imminent divorce. Tau found no indications of research and planning an attack, preattack preparation, probing and reaching behaviors, such as a dry run or surveillance, and no evidence of any physical attack. Tau therefore found P.T. was not suicidal on August 5, 2013. Tau disagreed with the diagnoses in the Grove Counseling

9

Center medical reports. He disagreed that P.T. had major depressive disorder and adjustment disorder. Tau did not assess P.T. for PTSD but noted that, if P.T. suffered from PTSD, Tau would have expected to see symptoms of it during the interviews. When Tau met with P.T., Tau also did not see any signs of P.T. suffering from anxiety disorder or autistic spectrum disorder.

P.T. told Tau he was dating women and had a social support network of friends keeping him busy. At P.T.'s second interview, in October 2014, P.T. said he was in a new relationship and was in the process of getting his contractor's license to be a plumber. He had new job prospects and less financial stress. Tau testified that P.T. also had a strong religious faith which was a significant stabilizing factor for P.T.'s mental health. His active military duty and duty as a reservist during the past four years provided additional stability for P.T. P.T. told Tau he had stopped taking his depression medication three months earlier because he was not depressed and the medication made him feel tired. Tau agreed with the Grove Counseling Center evaluation written after P.T.'s 5150 hold, that P.T. was not a danger to himself or others. Tau concluded A.T. was the primary cause of P.T.'s problems. P.T. had successfully put his divorce behind him and moved on to new, healthy relationships with women.

Tau acknowledged he did not contact Hughes, Cumming, or Grove Counseling Center, or interview A.T. Tau concluded that, because Hughes was an intern for only six weeks, he was a very inexperienced family and marriage therapist intern. Tau was unaware Hughes had a year of experience at Grove Counseling Center, not only as an intern but also as a trainee. Tau was also unaware Hughes was a former Marine and had

10

been in law enforcement. Tau was unaware Hughes did not make the determination P.T. qualified for a section 5150 referral. Rather, Cumming directed Hughes to contact the police, who made the determination. Tau was also unaware that Cumming closely supervised Hughes during the course of Hughes providing P.T. with therapy.

**Petition Regarding Return of P.T.'s Firearms**

On August 22, 2013, the Riverside City Attorney filed a petition under section 8102, subdivision (c), prohibiting P.T. from possessing firearms for five years. The Riverside Police Department requested a determination of whether the return of P.T.'s firearms would likely result in endangering P.T. or others. The attached police report showed that when P.T. was detained under section 5150, he owned five pistols, four rifles, and ammunition. P.T. filed a request for a hearing on Riverside's petition. The hearing was set and continued numerous times because of ongoing discovery.

On March 4, 2014, P.T. filed a request for hearing for relief from firearms prohibition. P.T.'s hearing request and supporting declaration stated that on August 2, 2013, A.T. served him with a TRO. On August 5, 2013, P.T. was detained under section 5150 and that same day was discharged from Riverside County Regional Medical Center Department of Psychiatry. Two weeks before that, he had been staying with various friends. P.T. filed for divorce on September 30, 2013.

Riverside's petition and P.T.'s petition were tried jointly as related cases. The bench trial began in September 2014, and was completed in January 2015, with the trial court deciding the two related petitions on January 12, 2015. The trial court granted Riverside's petition and denied P.T.'s petition, finding that the return to P.T. of his

11

firearms seized on August 5 and 6, 2013, was likely to endanger P.T. or others. The court further ordered the firearms, ammunition, and accessories were to be retained by a licensed California firearms dealer until P.T.'s rights to firearms and other items were restored. P.T. appealed the January 12, 2015 order.

III

APPLICABLE LAW

"Sections 5150 and 5151 permit a person to be taken into custody and detained for 72 hours when there is probable cause he or she is a danger to himself or others as a result of a mental disorder. [Citation.] Section 8103, subdivision (f) provides that when a person is admitted into a mental health facility under these sections, the individual may not own, possess, control, receive, or purchase firearms for five years after release from the facility. (§ 8103, subd. (f)(1).)" (*People v. Jason K.* (2010) 188 Cal.App.4th 1545, 1552 (*Jason K.*).)

The individual may request a hearing or petition to remove the firearms prohibition, as did P.T. in the instant case. (§ 8103, subd. (f)(3), (5); *People v. Keil* (2008) 161 Cal.App.4th 34, 38 (*Keil*).) "The People 'bear the burden of showing by a preponderance of the evidence that the person would not be likely to use firearms in a safe and lawful manner.' (§ 8103, subd. (f)(6).)" (*Jason K., supra,* 188 Cal.App.4th at p. 1553.) At the hearing on firearms possession, under section 8103, subdivision (f)(5), the court may consider a broad range of evidence, such as "declarations, police reports, including criminal history information, and any other material and relevant evidence that is not excluded under Section 352 of the Evidence Code." (*Keil,* at p. 38.) If the trial

12

court finds that the People have not met their burden, the firearms restriction shall be removed, and the individual shall be entitled to own, possess, control, receive or purchase firearms, unless another legal restriction applies. (§ 8103, subd. (f)(1); *Jason K.,* at p. 1553.)

We apply the substantial evidence standard of review to the trial court's determination that return of P.T.'s firearms would likely result in endangering P.T. or others. (*Keil, supra,* 161 Cal.App.4th at p. 38; *Jason K., supra,* 188 Cal.App.4th at p. 1553.) In determining whether the trial court's ruling is supported by substantial evidence, we view the record as a whole, "in a light most favorable to the ruling, resolving all evidentiary conflicts and drawing all reasonable inferences supporting the court's decision. [Citation.] If '"there is 'substantial evidence,' the appellate court *must affirm* . . . even if the reviewing justices personally would have ruled differently had they presided over the proceedings below, and even if other substantial evidence would have supported a different result."' [Citation.]" (*Jason K.,* at p. 1553.)

IV

SUBSTANTIAL EVIDENCE

P.T. contends the trial court's finding that return of his firearms would likely endanger him or others was not supported by substantial evidence. P.T. argues his therapist, Hughes, who made the section 5150 referral, lacked adequate training and was inexperienced. P.T. also argues his situation had changed and become more stable by the time of the hearing on his petition, and P.T. had never threatened any violence toward A.T.

13

The evidence is undisputed that Hughes did not make the section 5150 referral. After discussing the possibility of a section 5150 referral with his supervisor, Cumming, Cumming determined that a section 5150 referral should be made and authorized staff to call the police. The police then evaluated P.T. and determined he should be detained under section 5150 and transported to a mental health facility.

As to Hughes's level of training and experience, the record shows he had over one year of experience, amounting to 1,200 clinical hours working with patients at the Grove Counseling Center. Hughes explained that he was permitted to begin earning hours toward his marriage and family therapist license as a trainee, before completing his masters degree in psychology. After he received his masters degree, he became an intern and accumulated an additional 80 to 100 hours over 39 days, with a total of about 1,200 hours of experience as of August 5, 2013. In addition, Hughes had previously worked as a law enforcement officer and as a military policeman and criminal investigator in the marines. In the course of this employment, he received training on evaluating whether a person qualifies for a section 5150 detention and how to interact with people with mental health issues.

Furthermore, even though Hughes was an intern at the time, there was unrefuted evidence that Hughes was closely supervised by Cumming. Cumming had met with P.T. before August 5, 2013. He also had met and discussed with Hughes each of Hughes's therapy sessions with P.T. Although prior to August 5, 2013, Cumming did not believe P.T. was suicidal, after discussing with Hughes the therapy session on August 5, 2013,

Cumming believed P.T. was a danger to himself and others. Cumming therefore authorized calling the police for a section 5150 evaluation of P.T.

Although Cumming was not present at the Grove Counseling Center to personally observe P.T. on August 5, 2013, he was provided with sufficient information to make a reasonable determination that the police should be called to evaluate P.T. Grove Counseling Center's protocol prohibited Hughes, as an intern, from making a section 5150 referral, and Hughes did not do so. The evidence demonstrated that on August 5, 2013, Hughes complied with Grove Counseling Center's protocol which required Hughes to inform his supervisor that P.T. should be considered for a section 5150 referral. Cumming, not Hughes, made the determination that the police should be called to evaluate P.T. And neither Hughes nor Cumming made the section 5150 evaluation leading to P.T.'s section 5150 detention and hold. The police did so and then transported P.T. to the mental health facility, which also evaluated him, held him for five hours, and then released him. Those other than Hughes ultimately were responsible for P.T.'s section 5150 detention and hold. Therefore the fact that Hughes had been an intern therapist for only 39 days at the time of P.T.'s section 5150 referral is not a sufficient basis for concluding the section 5150 referral and hold was improper and unfounded.

We also reject P.T.'s contention that the trial court erred in denying P.T.'s petition because, by the time of P.T.'s petition hearing, his situation had changed and become more stable, such that returning his firearms to him would not likely endanger himself or others. P.T. argues that he had never threatened any violence toward A.T. But there was overwhelming evidence supporting a section 5150 detention of P.T. on August 5, 2013.

15

Some, but not all, of the factors leading to P.T. threatening to kill himself may have no longer existed a year later, when the trial court decided P.T. and Riverside's petitions. P.T. argues that the primary trigger of his stress leading to the 5150 hold on August 5, 2013, was his tumultuous relationship with A.T.

P.T.'s relationship with A.T. was a significant factor, but not the only factor leading to P.T.'s section 5150 hold. P.T.'s marital problems may have diminished by the time of the petition hearing, since A.T. and P.T.s divorce had become final in March 2014, and P.T. was involved in a relationship with another woman. Nevertheless, substantial evidence supports the trial court finding that there remained a danger P.T. would not use his firearms safely. There was evidence supporting a finding that, if P.T.'s current relationship with his girlfriend took a turn for the worse or he had employment or financial problems, or he suffered some other calamity or tragedy, he would again become mentally unstable and suicidal.

Hughes testified that on August 5, 2013, P.T. told him he was overwhelmed by what had happened in his life, including, not only his marital problems, but also the deaths of his children. P.T. stated he preferred to be with his deceased children and it would be no problem for him to make this happen. P.T. indicated he wanted to kill himself so that he could be with his deceased children. P.T. had alternative plans as to how he could accomplish this. He said he could go to a place outside his trailer where he was staying and shoot himself with one of his guns. If his guns were taken from him because of a section 5150 referral, he said he would work the system and, using "his military training to escape and to evade," he would kill himself by stepping in front of a

16

train.  P.T. stated clear plans to kill himself and those plans remained viable in the event P.T. suffered a significant loss or calamity triggering emotional instability.

Hughes's testimony demonstrated that P.T. was, not only a danger to himself on August 5, 2013, but was also a threat to A.T.  Right after saying he was going to kill himself, P.T. directed his anger toward her, stating he would "burn her in divorce."  From this statement, it is unclear whether P.T. intended to harm A.T. physically but, with his extreme anger and emotional volatility, the court could reasonably conclude P.T. was a danger to A.T., particularly in light of evidence of P.T.'s threat made to A.T. that "only one of us is getting out of this marriage alive."  There was also evidence P.T. was enraged at A.T. because he believed she had cheated on him.  P.T. had put a sign on A.T.'s car, stating, "Cheating Wife."

There was also evidence that P.T. made the same statements that he made to Hughes on August 5, 2013, to the police officers who performed the section 5150 evaluation.  P.T. also told the police that he had just lost his job, he had no money, he could not live without his wife, and he was going to die alone.  He said he had no one left in his life, he had no reason to go on living, and it was time to join his deceased children.

There was not only substantial evidence supporting a section 5150 referral on August 5, 2013, but also substantial evidence a year later, supporting the trial court's findings that, despite P.T.'s improved circumstances, P.T. still lacked the ability to cope when confronted with significant stress factors.  Therefore returning P.T.'s firearms would likely result in endangering P.T. or others.  There remained the underlying stress factors and emotional scars from P.T. suffering the tragic deaths of his children and first

17

wife, and going through a relatively recent divorce. In addition, P.T. had stopped taking his depression medication without a physician's approval.

The evidence shows that P.T. was making good progress toward recovering after his section 5150 hold, but the trial court could reasonably conclude that such progress was recent and there still remained the risk that he would revert to his previous mentally unstable state and endanger himself and others, if his firearms were returned to him and he suffered a significant stress factor. P.T. had been hospitalized on another occasion in 2010 for depression and anxiety, as well as during the section 5150 hold in 2013. The trial court could reasonably conclude there remained unresolved risk factors that could resurface if P.T. again encountered a relationship conflict or other stress factor. There was substantial evidence P.T. remained susceptible to becoming a danger to himself or others, if firearms were in his possession and his circumstances took a turn for the worse.

Although there may have been evidence favorable to P.T., such as P.T. and Tau's testimony, which supported a finding that P.T. was likely to use firearms in a safe and lawful manner, this court must resolve all evidentiary conflicts and draw all reasonable inferences in favor of the trial court's decision. (*Jason K., supra,* 188 Cal.App.4th at p. 1553.) Where, as here, there is substantial evidence supporting the trial court's decision, this court must affirm the decision, even if other evidence would have supported a different result. (*Ibid.*) We conclude the People met their relatively low burden of proof by establishing by a preponderance of the evidence that the return of P.T.'s firearms was likely to pose a danger to P.T. and to others.

## V

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.