Filed 12/9/22 P. v. Valenciano CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>FRANCISCO JAVIER VALENCIANO,<br><br>　　Defendant and Appellant. | H049401<br>(Santa Cruz County<br>Super. Ct. No. F17283) |

Convicted in 2009 of first degree murder (Pen. Code, § 187, subd. (a)),[1] Valenciano filed a petition for resentencing under section 1172.6, alleging that his crime no longer constituted first degree murder under 2018 amendments to the felony murder law (Stats. 2018, ch. 1015, § l, subd. (f); § 189, subd. (e)(3)).[2] The trial court denied the petition after finding that Valenciano was a major participant in the underlying crime and acted with a reckless indifference to human life. On appeal, Valenciano challenges the sufficiency of the evidence to support the trial court's findings. We affirm.

---

[1] Unspecified statutory references are to the Penal Code.

[2] Valenciano initially filed his petition under former section 1170.95. Effective June 30, 2022, former section 1170.95 was renumbered to 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.) For clarity, we refer to the statute as section 1172.6.

## I.    BACKGROUND[3]

### A.    *Valenciano's Trial*

#### 1.    *The Information*

On December 8, 2004, Valenciano was charged by information with conspiracy to commit robbery (§ 182, subd. (a)(1); count 1), first degree murder (§ 187, subd. (a); count 2), five counts of second degree robbery (§ 211; counts 3-7), and two counts of attempted second degree robbery (§§ 664, 211; counts 8 & 9).[4]  As to counts 2 through 9, it was alleged that the crimes were committed for a criminal street gang (§ 186.22, subd. (b)(1)), as to counts 2 and 3, it was alleged that a principal personally discharged a firearm causing death (§ 12022.53, subds. (d) & (e)(1)), and as to counts 4 through 9, it was alleged that a principal personally used a firearm in the commission of the offenses (§ 12022.53, subds. (b) & (e)).

#### 2.    *Rodolfo Escobar's Murder*

The morning of July 25, 2004, Rodolfo Escobar was playing poker with several other men in the driveway of a Santa Cruz apartment complex when a car used the driveway to make a three-point turn, then parked nearby.  Two men got out of the car and

---

[3] This court granted the parties' requests for judicial notice of the trial record and this court's opinion in Valenciano's direct appeal, *People v. Soto et al.* (June 26, 2012, H034605) [nonpub. opn] (*Soto*).  We observe that both parties here rely on the factual summary contained in our prior opinion.  We derive our recitation of the factual and procedural history of this case both from our prior opinion and the trial record.  (See *People v. Clements* (2022) 75 Cal.App.5th 276, 292 (*Clements*) ["trial judges should not rely on the factual summaries contained in prior appellate decisions" during evidentiary hearing on section 1172.6 petition].)  A more detailed summary of the facts can be found in our prior opinion.

[4] Valenciano and codefendants Juan Lorenzo Soto and Anthony Gonzales were charged in the same information.  In 2005, on motion of Soto and Valenciano, the trial court severed their trial from Gonzales's.

approached, one carrying a shotgun, the other a revolver. A third suspect stood next to the car, watching the others from about 20-25 feet away.

One of the two gunmen told the group, "Give me your money, . . . pinches putos" ("fucking assholes"), in English and Spanish. Each of Escobar's six companions complied, emptying their pockets and throwing money on the ground; one of Escobar's companions handed $80 to the man with the shotgun, who then struck him in the back with the gun, knocking him to the ground.

Escobar told the gunmen, "I am not giving you my money. I have to work hard for this and I have a family to support." Escobar started to pick up the money from the ground. One of Escobar's friends urged Escobar several times to give the men his money, but Escobar refused. The man with the shotgun demanded, "Puto, give me the money." Escobar said, "Chinga su madre" ("Fuck your mother").

"[W]ithin a few moments" of Escobar's refusal, the man with the shotgun fired it point-blank at Escobar's head. The third suspect had been watching the group but said nothing to his companions during the robbery and shooting. The two gunmen collected the money from the ground, and the three fled by car. As they left the scene, one of the men yelled, "Northside!"

### 3. *Valenciano's Involvement*

V.M. and Gonzales had a child together, and she knew that Gonzales was a member of the Varrio Green Valley (VGV) gang. V.M. also knew Soto and Valenciano and believed both of them to be gang members. She knew Valenciano had on occasion been involved in distributing money to the families of gang members. He had once given V.M. an envelope of money to forward to a girlfriend of a VGV member. One Christmas, Valenciano gave V.M. some cards to deliver. Because one of the cards was not sealed all the way, V.M. saw that there was money inside. When Gonzales was

arrested for a parole violation, Valenciano also gave V.M. money to give to Gonzales's mother to hire an attorney and to put money on Gonzales's inmate account.

The week before Escobar was killed, V.M. heard Valenciano tell Gonzales that he needed money and that he was going to rob somebody if his girlfriend, M.Z., did not lend him enough to pay a $200 gang tax to Oscar Cabrera. V.M. described Valenciano and Gonzales as "joking around but still talking about it," and Gonzales laughed at Valenciano's proposal. V.M. did not remember whether Gonzalez responded verbally: "I just remember him laughing – like it's hard to explain. You have to understand their relationship. They were pretty close . . . [r]eally close . . . ."

According to the prosecution's gang expert, Oscar Cabrera, a member of Northside Watsonville, was either associated with or a member of Nuestra Familia, described as the "supreme Norteño prison gang." VGV was a Norteño subset. At the time of Escobar's murder, Nuestra Familia was imposing average taxes of about $200 a month, and Norteño gang members who did not pay the tax were subject to assaults and "a lot of intimidation." Oscar Cabrera was working the Watsonville area for the Nuestra Familia gang. Julio Cabrera, Oscar's brother, was a VGV gang member, as were Valenciano, Soto, and Gonzalez.

The prosecution gang expert described VGV as one of the most violent gangs in the area. VGV's primary activities included "the sales of narcotics, some serious assaults and homicides." Gonzales had previously been convicted of crimes involved in a "jump-in"—a "physical beating by gang members" that serve as a gang initiation—at an open field where multiple assaults took place. Soto also had a criminal history; he was involved in an assault where the victim was kicked and punched, but he was not arrested or charged in connection with that case. Soto was also involved in an attempted robbery where he stood behind the victim and held a box cutter. A different VGV gang member was convicted of murder for a fatal shooting. And another VGV gang member was

4

convicted of assault with a deadly weapon and a gang enhancement after he and another person beat and assaulted a man on school grounds in front of the man's young son. "[V]iolence equals respect" within a gang and instills fear in the community at large. Gang members involved in violent acts are more feared and gain more respect from fellow gang members and with rival gang members. When gang members feel disrespected, they retaliate, whether by crossing out a rival gang's graffiti or committing a homicide, depending on the situation.

The night before Escobar's murder, Soto and his girlfriend, C.H., spent the night at V.M.'s house. At one point, Soto, Valenciano, and Gonzales left in C.H.'s car, returning after midnight. In the morning, Soto asked C.H. again if he could borrow her car, saying he wanted to go to church and "release his sins." Although C.H. refused, Soto took her keys and left. Later that day, V.M. was driving with C.H. and others when Gonzales called her, saying that Soto needed to talk to C.H. V.M. gave her phone to C.H., and Soto told C.H. that she needed to report her car as stolen. V.M. convinced C.H. to make the false report, warning that Oscar Cabrera and VGV members would hurt them and their families if they failed to comply.

Later that afternoon, V.M. received a phone call from Julio Cabrera. Julio told V.M. to come pick him up and to bring her son with her. When V.M. arrived at the house where Oscar and Julio lived, she saw Oscar and Julio standing next to Oscar's truck. Gonzales got out of the truck's passenger seat and came to V.M.'s car. Gonzales told her that Oscar was going to take him to Mexico, and that Julio would be in contact with V.M. Oscar snapped his fingers, so Gonzales said goodbye to V.M. and got into the truck, where V.M. could see Valenciano and Soto sitting.

The next day, however, V.M. found Gonzales at the home of his grandmother. Over the next week, Gonzales told V.M. about the robbery-murder. Initially, Gonzales, Soto, and Valenciano had planned to rob a liquor store in Santa Cruz. However, when

5

they arrived at the liquor store, parking was sparse and Valenciano did not want to park in the handicapped zone, so they continued driving. As they drove, they came across a group of men playing poker in a driveway with money on the ground. Gonzales said that they robbed the men, with Valenciano staying by the car while Gonzales and Soto confronted the group. Gonzales told V.M. that one of the men was killed after he tried to take back his money and talked back to the shooter. Gonzales denied being the shooter. Afterwards, the group fled. They listened to the police scanner, left the car by a creek or river, and threw the weapons into the bushes. The group then went to a "homeboy's house" (owned by "someone that Oscar Cabrera knew") in Hollister, where they had a barbeque and drank alcohol.

Gonzales was angry with Valenciano and said things like, "If it weren't for [Valenciano], we wouldn't be in this situation," and "[i]t's all [Valenciano's] fault." Gonzales also told V.M. that if he saw Valenciano, he would "kick his ass." Another time, V.M. had said that she heard Gonzales saying, "All this shit for [Valenciano], all this shit, I can't fucking believe it."

V.M. was afraid of Oscar Cabrera. After Gonzales, Soto, and Valenciano were arrested a week after Escobar's death, Oscar Cabrera went to V.M.'s house looking for her. V.M. was not home, but her parents told her that Oscar was looking for her. V.M. called Oscar's brother Julio, who arranged for her to meet Oscar at Valenciano's house. When V.M. arrived at Valenciano's house, Valenciano's father was sitting on the stairs holding his head, which was "dripping in blood." Valenciano's mother told V.M. that Oscar had left. Oscar had asked Valenciano's father for bail money; when the father said he was unable to help, Oscar slashed the father's head.

When they eventually met, Oscar told V.M. to keep an eye on C.H., and that if V.M. or C.H. had any contact with law enforcement or said anything, he would find out and the two women would "end up six feet underground." Sometime later, V.M. saw

6

Valenciano, who told V.M. not to talk to the police and assured her that law enforcement had no evidence. He also told her that if she needed to talk to him, she should do so in person so that there would be no phone evidence.

A jailhouse informant was housed with both Valenciano and Soto at separate times. At trial, the informant testified that Soto said that he and Gonzales had intended to rob a liquor store in Santa Cruz, so they had driven to Valenciano's house to pick up guns. The liquor store was too crowded, so they drove around the block and saw some men playing poker. Valenciano stayed with the car and listened to the police scanner, while Gonzales and Soto walked up to the group of men and demanded their money. One of the men disrespected Gonzales, who shot him. Gonzales and Soto then went back to the car, drove down the block, and hid the guns. Valenciano threw the police scanner, its batteries, and the car keys in different directions. Soto called his girlfriend to tell her to report the car as stolen, and Valenciano called "their homeys" to come and pick them up.

The informant also testified that Valenciano had told him about the shooting several times. Valenciano's account was largely the same as Soto's, except Valenciano added that the guns belonged to their gang, VGV, and that Valenciano was the one initially had the guns in his possession. Valenciano said that he and Gonzales planned to rob a liquor store, but the store was too crowded. Later, they came across a group of men playing dice and gambling. Valenciano described one of the men as refusing and recounted that Gonzales "kept at it" until the victim disrespected Gonzales, who responded by shooting him. Valenciano also said that the group hid in the bushes after the killing and hid some of their clothing in a garbage bin before running to a lake or creek where they discarded the police scanner and keys.

7

### 4. *The Verdict and Sentencing*

On April 6, 2009, a jury convicted Valenciano of all counts as alleged and found true each of the special allegations. Valenciano was sentenced to a determinate term of 34 years consecutive to an indeterminate term of 50 years to life.

### B. *The Petition for Resentencing*

In January 2019, Valenciano filed a petition for resentencing under section 1172.6, alleging that the prosecution had proceeded on the theory that he was guilty of first degree felony murder, and he could no longer be convicted of first degree murder under the current law. The People opposed Valenciano's petition, arguing that he failed to state a prima facie case for relief. The People insisted that the trial record reflected that Valenciano was a major participant in the underlying crime who acted with reckless indifference to human life.

The trial court determined that Valenciano had stated a prima facie case for relief, issued an order to show cause, and set the matter for an evidentiary hearing.

No new evidence or testimony was presented at the evidentiary hearing. The trial court stated that it had considered the reporter's transcript of Valenciano's trial, which established that "[Valenciano] came up with the idea to commit the robbery in order to pay a $200 gang tax." The trial court also found that "Valenciano provided the two guns," which were "gang guns which he maintained custody of." Furthermore, the trial court noted that there was evidence that Valenciano was a gang member and was familiar with both Gonzales and Soto, who were all "adhering to the gang credo that all three of them were prone to violence." And "by prior agreement and planning[, Valenciano] acted as the get away driver, the driver of the vehicle," and he "stood in a position to stand guard over the commission of the robbery offense" and was able to see and hear when Gonzales had his gun to Escobar's head. After Escobar was killed, Valenciano failed to assist the victim and or prevent the shooting "when there may well have been

8

time to do that given how other victims acted when the homicide victim protested that he was not going to willingly give up the money," and further assisted his accomplices in evading arrest, fleeing, discarding the weapons, and abandoning the vehicle. He did not call 911 and "spent the afternoon or evening after the killing drinking with [Gonzales and Soto] in a gang safe house."

Based on the foregoing, the trial court concluded that the circumstances showed that Valenciano was "subjectively aware that his participation in this robbery presented a grave risk of death at the time of the commission of the robbery;" thus, it was "established beyond a reasonable doubt that [Valenciano] did act with reckless indifference" and that he was a major participant in the crime. Thereafter, the trial court denied Valenciano's petition for resentencing.

## II. DISCUSSION

On appeal, Valenciano challenges the sufficiency of the evidence supporting the trial court's findings that he was a major participant and acted with reckless indifference to human life. Viewing the evidence in the light most favorable to the judgment, we conclude that substantial evidence supports the trial court's determinations.

### A. *Senate Bill No. 1437*

Senate Bill No. 1437 (Reg. Sess. 2017-2018) amended the Penal Code "as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § l, subd. (f); § 189, subd. (e)(3).)

Defendants convicted of murder based on the natural and probable consequences doctrine prior to passage of Senate Bill No. 1437 can now petition for resentencing on the ground that they could not be convicted of murder under the current version of the law. (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) Upon a petitioner's prima facie showing

9

of entitlement to relief, the prosecution has the burden to establish, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under a legally valid theory. (§ 1172.6, subd. (d)(3).)

We review a trial court's factual findings in connection with a section 1172.6 petition for substantial evidence. (*Clements*, *supra*, 75 Cal.App.5th at p. 298.) Thus, "[w]e ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant] guilty beyond a reasonable doubt." ' " (*Ibid.*) That the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment. (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071 [defendant on substantial evidence review "bears an 'enormous burden' "].)

## B.    Banks/Clark *Factors*

The California Supreme Court has sought to clarify the circumstances under which an accomplice who lacks the intent to kill may qualify as a major participant in *People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*). The high court identified the relevant inquiry as including the following: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force used?" (*Id.* at p. 803, fn. omitted.) The *Banks* court clarified that "[n]o one of these considerations is necessary, nor is any of them necessarily sufficient" and that all the factors may be weighed to determine whether the defendant was a major participant. (*Ibid.*)

10

In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court addressed the mental state of reckless indifference to human life, holding that it comprises both subjective and objective components. (*Id.* at p. 617.) "The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.' " (*Ibid.*) Factors to be considered—some of which overlap with those examined in *Banks*—include: (1) a defendant's knowledge of weapons, use of weapons, and number of weapons; (2) a defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the crime; (4) a defendant's knowledge of his or her cohort's likelihood of killing; and (5) a defendant's efforts to minimize the risks of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618-622; *In re Scoggins* (2020) 9 Cal.5th 667, 677 [applying *Clark* factors].) Like the factors considered in *Banks*, " 'no one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, at p. 618.)

The high court in *Clark* acknowledged "the interrelationship" between major participation in an underlying felony and reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 614.) The two requirements significantly overlap, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Id.* at p. 615.)

11

## C.    *Analysis*[5]

### 1.    *Major Participant*

Although Valenciano did not actively engage with Escobar or any of the robbery victims, "[t]he ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major." ' " (*Clark*, *supra*, 63 Cal.4th at p. 611.)  The record amply supports the trial court's determination that Valenciano was a major participant in the robbery.

Many of the factors described in *Banks* apply here.  V.M.'s personal observations, her account of Gonzales' admissions, and the jailhouse informant supported the inference that Valenciano was the instigator and organizer of the armed robbery, notwithstanding his lesser degree of direct involvement in its actual commission.  V.M. observed that it was Valenciano who initially suggested to the recently paroled Gonzales that the men commit a robbery because Valenciano needed money to pay a gang tax to Oscar Cabrera.  Gonzales later blamed Valenciano for the shooting, complaining to V.M. that everything was Valenciano's fault, implying Valenciano's responsibility for planning the crime.  (See *Banks*, *supra*, 61 Cal.4th at p. 803.)  Valenciano told the jailhouse informant that he supplied the guns—entrusted to his custody by VGV—that Gonzales and Soto used during the murder.  (See *Banks*, *supra*, 61 Cal.4th at p. 803.)

Further, there was evidence from which the trial court could infer that Valenciano knew of the dangers posed by committing the underlying robbery.  (See *Banks*, *supra*, 61

---

[5] Preliminarily,  we reject Valenciano's claim that the trial court may have applied the wrong legal standard when evaluating his petition because the minute order makes a reference to "reckless negligence" and not "reckless indifference."  During the hearing, the trial court correctly used the term "reckless indifference," specifically referenced both *Banks* and *Clark*, and, in its analysis, discussed the factors set forth in those cases.

Cal.4th at p. 803.) It is undisputed that he supplied the firearms and that at least the shotgun was loaded. Having vetoed the liquor store as a target based on the number of people present, he stopped the car to permit Gonzales and Soto to hold up a group of no fewer than seven men curbside in a residential neighborhood during daylight hours, factors which an objective observer might conclude increased the likelihood of resistance or danger. The trial court could also legitimately conclude that Valenciano—as a member of a gang known for violence and a culture where violence is equated with respect—was aware not only of VGV's reputation for violence but of prior violent acts by Soto and particularly Gonzales, who V.M. described as his very close friend.

Additionally, the record supports an inference that Valenciano was aware of the escalating conflict between Gonzales and Escobar as the robbery progressed. (*Banks*, *supra*, 61 Cal.4th at p. 803 [presence at the scene of the killing and action or inaction playing a particular role in death].) An eyewitness testified that Valenciano was merely 20 to 25 feet away looking toward the group as Gonzales and Soto confronted Escobar and his companions. Valenciano's close physical presence to the scene of the killing may signify "significantly greater culpability" compared with a defendant who is absent from the scene. (*In re Loza* (2017) 10 Cal.App.5th 38, 50 (*Loza*).)

After the killing, Valenciano fled with Soto and Gonzales and helped facilitate their escape. Although the evidence suggests that it was Gonzales who drove away from the scene, Valenciano used a payphone to call the group's "homeys," presumably fellow gang members, to assist in their escape after abandoning C.H.'s car. Soto also told the jailhouse informant that it was Valenciano who disposed of the police scanner, its batteries, and the car keys to prevent their discovery.

Accordingly, there was substantial evidence to support the inference that Valenciano planned the robbery, supplied the weapons, drove all participants to the scene, remained in close proximity and observed their interactions, and facilitated their

13

escape by monitoring the scanner, disposing of it, and securing safe transport. This evidence is sufficient to support the trial court's factual finding that he was a major participant in the underlying robbery.

### 2.      *Reckless Indifference*

Next, we conclude that there is sufficient evidence in the record that Valenciano displayed a reckless indifference to human life based upon the factors described by the California Supreme Court in *Banks* and *Clark*. As noted, the factors considered in determining whether a defendant was a major participant and whether he or she acted with reckless indifference overlap, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.)

We first consider Valenciano's knowledge and involvement as to the use of weapons in the robbery. (*Clark*, *supra*, 63 Cal.4th at p. 618 [knowledge of weapons].) To be sure, mere knowledge that guns will be used during a robbery does not by itself establish a reckless indifference to human life. (*Ibid.*; see *In re Ramirez* (2019) 32 Cal.App.5th 384, 404 (*Ramirez*) [insufficient evidence of reckless indifference even though the defendant supplied the guns that were used in the robbery and murder and knew they were operable].) But this factor supports the trial court's finding that Valenciano acted with reckless indifference because Valenciano not only knew Gonzales and Soto were armed but was the one who had supplied both guns. The trial court could also reasonably infer that Valenciano, as the custodian of the guns for VGV, was aware that the guns were loaded.

As for physical proximity to the crime and opportunities to restrain the crime, this factor also supports the trial court's determination. The trial court could legitimately conclude that, as the instigator of the robbery and its intended beneficiary, Valenciano had the ability to prevent it from happening or could have directed the others to abort,

14

and that from his vantage point mere feet away from Escobar and his companions, he was aware of the heightened tension from Escobar's resistance.

As for knowledge of his cohorts' propensity for violence or peacefulness, knowledge of a person's gang membership does not, without more, equate to knowledge that the person is likely to kill. (*Banks*, *supra*, 61 Cal.4th at pp. 810-811; *In re Miller* (2017) 14 Cal.App.5th 960, 976 [defendant and killer belonged in same gang but there was no evidence that either of them had ever participated in lethal violence]; *Ramirez*, *supra*, 32 Cal.App.5th at p. 405 [even assuming that defendant knew killer was gang member, there was no evidence to show knowledge of killer's likelihood of killing].) But the trial court could have reasonably inferred from the particular gang evidence in this case that Valenciano was sufficiently immersed in VGV and its feudal relationship with Nuestra Familia to be aware of an enhanced potential for violence in the event of resistance—whether in furtherance of VGV's reputation or in defense of one's own in the eyes of peers or those higher in the hierarchy. (See *Clark*, *supra*, 63 Cal.4th at p. 621.) Beyond the gang expert's testimony about the role of violence in maintaining respect, enforcing discipline, and retaliating, sometimes with lethal force, if disrespected, Valenciano, Soto, and Gonzales were all members of VGV, which was reputed to be one of the most violent gangs in the area. Valenciano was also sufficiently involved in VGV operations to have had at least on occasion the responsibility of distributing financial support to the friends and family of VGV members in custody. Yet VGV members were also obliged to pay taxes to Oscar Cabrera for Nuestra Familia, or else face violent consequences of sufficient gravity that Valenciano preferred to risk engaging in a daytime armed robbery in public view. And Valenciano took this risk despite having enough of a relationship with Oscar Cabrera that the latter would later assist the three men in their ultimately abandoned plan to escape to Mexico and intercede, violently, with Valenciano's own father in an attempt to secure Valenciano's release on bail. Given the

15

nature of Valenciano's involvement in VGV and relationship with Cabrera, the trial court could conclude that Valenciano was aware that the urgency of the robbery and the necessity of enforcing respect through violence made it particularly likely that fellow VGV participants would respond to resistance with force.

As to Valenciano's awareness of the potential for violence presented by Gonzales and Soto in particular, there was evidence that Gonzales had previously been convicted in connection with his involvement with a "jump-in" at a field that involved physical assaults, and Soto had been implicated and involved in an assault and an attempted robbery with a box cutter. Given the reputational value of violence to which the gang expert testified, the trial court could infer that Valenciano was aware of these prior acts. Gonzales and Valenciano were also close friends, and the ease to which they joked about robbing someone—and presumably thereafter both agreed to do so—supports the inference that to the two men, the risks of violence attendant upon an armed robbery did not warrant significant discussion.

Thus, Valenciano's willingness to engage in an armed robbery with two fellow members of a violent gang who themselves have a history of violent acts tends to support the trial court's determination that he was recklessly indifferent to the grave risk of death from his actions. (*In re Parrish* (2020) 58 Cal.App.5th 539, 544 [defendant knew cohorts were not peaceable or cautious because one was a longtime Crips member and the other had threatened to kill the defendant himself]; *People v. Medina* (2016) 245 Cal.App.4th 778, 791-792 [evidence that defendant and accomplice were willing to employ potentially deadly violence].) In this particular case the trial court could reasonably infer from the evidence that Valenciano knew that his accomplices had a likelihood of engaging in violence—potentially lethal violence—if disrespected. (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 594 [knowledge of codefendant's propensity for violence was

16

considerable when codefendant was brother, belonged to the same gang, and defendant knew that his fellow gang members had a history of violence and celebrating violence].)

Substantial evidence also supports the trial court's finding that Valenciano had an opportunity to minimize the risk of violence during the robbery itself but failed to do so. (*Clark*, *supra*, 63 Cal.4th at p. 621-622 [defendant's efforts to minimize risk of violence].) Although the robbery took place over a matter of minutes, the evidence reflects that there had been a colloquy between Escobar and Gonzales of sufficient length that Escobar's companions had time to interject "several times," urging him to comply with Gonzales's demands, before Gonzales shot Escobar, and that Valenciano was watching the group at the time. Given Valenciano's proximity to the scene, the trial court could have reasonably inferred that there was a brief window of opportunity for Valenciano to intervene or attempt to deescalate the violence. (*In re McDowell* (2020) 55 Cal.App.5th 999, 1014 [defendant had a brief but critical opportunity to intervene when accomplice fired a warning shot]; *Loza*, *supra*, 10 Cal.App.5th 38, 51 [defendant did not intervene when accomplice counted down for five seconds before shooting].)

We acknowledge that some of the *Banks* and *Clark* factors are either neutral or do not support a finding of reckless indifference. Although Valenciano failed to render aid after the murder, there was "no evidence that [Escobar] might have survived had [Valenciano] acted differently" after the shooting, as nothing in the record suggests that medical aid could have mitigated the immediate effect of the point-blank shotgun blast to Escobar's head. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 559 (*Taylor*).) The forensic pathologist testified that about three-quarters of Escobar's brain came separately in a plastic bag for the autopsy, and the top part of Escobar's head was missing. Moreover, there were multiple witnesses to the murder who could have attempted to render or seek medical aid, had Escobar's condition been less obviously beyond help.

17

Valenciano's actions after the group fled were also ambiguous at best—for example, he participated in covering up the group's actions by throwing away the police scanner and calling "their hom[ies]" to come and pick them up. Yet it is unclear whether Valenciano's actions demonstrated that he acquiesced or approved of the use of lethal violence, or whether he simply wanted to avoid arrest. (*Clark*, *supra*, 63 Cal.4th at p. 620 [ambiguous circumstances surrounding defendant's hasty departure make it difficult to infer frame of mind].) And though V.M. testified that Valenciano, Gonzales, and Soto later went to a "homeboy's house" to drink and have a barbeque after the murder, the inference that Valenciano displayed a post-homicide callousness after Escobar was killed does necessarily demonstrate reckless indifference during the commission of the crime. "[E]ven if a defendant is unconcerned that a planned felony resulted in death . . . there must also be evidence that the defendant's participation in planning or carrying out the crime contributed to a heightened risk to human life." (*Taylor*, *supra*, 34 Cal.App.5th at p. 560.)

And finally, Valenciano argues that the group's decision to abandon their plan to rob the liquor store demonstrates a clear intent to minimize the risk of violence. (*Clark*, *supra*, 63 Cal.4th at p. 621.) Valenciano relies on the jailhouse informant's testimony that Valenciano had said the liquor store was too crowded. But a plausible inference from the informant's testimony—together with Gonzales's statement to V.M. that Valenciano had not wanted to park in a designated disabled parking space—is that the Valenciano decided against the liquor store because the number of witnesses and congested parking would make it more difficult to evade pursuit, rather than to minimize the risk of violence. Even assuming Valenciano considered the unspecified crowd size at the liquor store to increase the risk of violence, the decision to rob a group of no fewer than seven adult men on a residential street in broad daylight would seem to do little to minimize the risk of resistance and responsive violence.

Citing *Enmund v. Florida* (1982) 458 U.S. 782, Valenciano maintains that that the evidence here merely demonstrates that he was involved in the crime solely as an "unarmed lookout for a spontaneous robbery of a poker game that ended in an unexpected or unforeseeable shooting."[6] Adopting Valenciano's position, however, would require us to abandon our deferential review for substantial evidence and reject the evidence that supports the trial court's determination that Valenciano was more than a lookout and that the robbery he instigated was more than spontaneous. Valenciano's position would also require us to reweigh the evidence in his favor, exceeding our proper role. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60 [reviewing court does not reweigh evidence].)

Considering the totality of the circumstances together, the trial court's determination that Valenciano acted with reckless indifference to human life is supported by the evidence that he (1) supplied and armed his cohorts with firearms; (2) remained in close physical proximity to the crime; (3) knew of his cohorts' propensity for violence given evidence of the gang's violence, his own membership within the gang, and his familiarity with Gonzales, the shooter; and (4) did not take the opportunity to minimize the risk of violence during the robbery when Escobar engaged Gonzales and resisted his demands for compliance. In reaching our conclusion, we are mindful that our review is for substantial evidence, and we must affirm " ' "even if the reviewing justices personally would have ruled differently had they presided over the proceedings below, and even if other substantial evidence would have supported a different result." ' " (*People v. Jason K.* (2010) 188 Cal.App.4th 1545, 1553.) Although reasonable triers of fact may differ,

---

[6] In *Enmund*, the United States Supreme Court held that the Eighth Amendment bars the death penalty for an aider and abettor "who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund*, *supra*, 458 U.S. at p. 797.)

once we as a reviewing court discern substantial evidence to support the trial court's factual findings, our inquiry concludes.

## III.  DISPOSITION

The order denying Valenciano's petition for resentencing under Penal Code section 1172.6 is affirmed.

_____
LIE, J.

WE CONCUR:


_____
GREENWOOD, P.J.


_____
GROVER, J.


*People v. Valenciano*
H049401